GEORGE W. WOMACK v. H. H. COLEMAN and Another.[1]

June 10, 1904.

Nos. 13,867—(87).

**Contract Construed.**

> A certain contract construed, and *held* to be an option for the purchase of real estate, and not a contract of purchase.

**Evidence—Option.**

> The evidence tended to show that plaintiff possessed an option or authority to sell the premises upon the terms and in the manner described in the contract.

**Former Decision—Damages.**

> The previous decision adhered to—that the $15,000 note in escrow was intended by the parties to be stipulated damages. The evidence tended to show that plaintiff had performed his part of the option contract, and had not waived any of the provisions to be performed by defendant.

Action in the district court for Hennepin county to recover $15,000 and interest from defendants, H. H. Coleman and C. E. Lindberg, maker and indorser respectively of a promissory note deposited in escrow for the use of plaintiff under the agreement set forth in the opinion. The case was tried before Harrison, J., who granted defendants' motion to dismiss, upon conclusion of plaintiff's testimony. From a judgment of dismissal, plaintiff appealed. Reversed.

*Franklin H. Griggs,* for appellant.

*A. D. Smith,* for respondents.

LEWIS, J.

Upon a former appeal of this action (89 Minn. 17, 93 N. W. 663) the contract now under consideration was before the court upon certain questions with respect to the abstract of title, the time it was to be examined and delivered, the validity of the title tendered, and the nature of the stipulation for indemnity. The cause, having been remanded, was again tried; and at the close of plaintiff's case, on motion of defendants, the action was dismissed, and, judgment having been entered to that effect, plaintiff appeals.

[1] Reported in 100 N. W. 9.

The following questions are presented:

Is the contract referred to one of purchase and sale, within the meaning of chapter 223, p. 431, Laws 1897, and was Coleman entitled to notice, to terminate his rights in the contract?

Is there any evidence to show plaintiff ever possessed an option to sell the property referred to in the contract, and that he was ever able to perform it?

If plaintiff did possess such option, and had authority to enter into the contract with Coleman, then did not Coleman have a reasonable time after the twenty days expired (April 16) to pass upon the objections to the title raised by his attorney, and secure their correction, and did not plaintiff grant such extension, and waive his right to declare a forfeiture of the $15,000 without further notice to Coleman?

For clearness, the contract is here set out in full, with the exception of the description of the property:

This agreement made and entered into this 27th day of March, A. D. 1901, by and between George W. Womack of the city of St. Paul, county of Ramsey and state of Minnesota, party of the first part, and H. H. Coleman of the city of Minneapolis, county of Hennepin, state of Minnesota, party of the second part:

Whereas, the said George W. Womack, party of the first part herein, has represented that he holds an option of purchase upon the hereinafter described property, and that said option expires on or about the first day of April A. D. 1901, and whereas he is desirous of conveying said option and confirming the sale of the hereinafter described premises to H. H. Coleman party of the second part herein:

Witnesseth, that the said party of the first part in consideration of the covenants and agreements of said party of the second part hereinafter contained, does hereby sell and agree to convey or cause to be conveyed unto the said party of the second part or his assigns by deed of warranty upon the prompt and full performance by the said party of the second part of his part of this agreement, the following described premises situate

in the county of Ontonagon, state of Michigan, and known as the Norwich Mines, and more particularly described as follows, to wit:   *   *   *

And the said party of the second part in consideration of the premises, hereby agrees to pay to the said party of the first part as and for the purchase price of said premises, the sum of One Hundred Forty-Five Thousand ($145,000) Dollars in manner and at the times following, to wit:

First: at the signing of this contract said second party's certain promissory note for Fifteen Thousand ($15,000) Dollars with an endorser thereon duly accepted by said party of the first part, due and payable April 5th, 1901, said note to be placed in escrow with Joseph Lockey, Cashier of the National German-American Bank of St. Paul, Minnesota, and the said Joseph Lockey upon maturity of said note, is hereby authorized and instructed upon request of either party hereto to protest said note for nonpayment thereof, it being understood and agreed that the foregoing note or the cash equivalent thereto as the case may be, is placed in escrow conditioned that the said second party shall fulfil the terms of this contract, and should he not fulfil same, that the said note or the moneys equivalent thereto shall be absolute forfeiture and indemnity to the said party of the first part or those whom he may represent, and that this agreement and all the conditions thereof upon said forfeiture, shall be absolutely null and void as to all parties hereto.

And the said party of the second part agrees to make a further payment of twenty-five thousand ($25,000) dollars on the purchase price of the hereinbefore described property on June 1st, 1901, twenty-five thousand ($25,000) dollars August 1st, 1901, forty thousand ($40,000) dollars October 1st, 1901, and the balance of said purchase price on January 1st, 1902, and all deferred payments herein shall bear interest at the rate of six per cent. per annum before and after maturity.

And the said party of the first part in consideration of the premises herein agrees to furnish said second party, within ten (10) days of the date of this agreement, a full and complete

abstract to date of the hereinbefore described properties, and that the said second party herein shall thereafter have twenty days from the delivery of said abstract for examination and acceptance of the title thereof, and it is further understood and agreed by and between the parties hereto, that should the title of the properties hereinbefore described prove defective sufficient to warrant said second party in rejecting same (a reasonable time to be allowed to correct any imperfections in title) then and in that case the said note or the moneys equivalent thereto placed in escrow as a forfeiture under this contract, shall be returned in full to the said second party herein, and he shall be placed to no further expense than such as he may have incurred by reason of the examination of the title to said properties, or expenses contingent thereto.

And the said party of the first part further agrees with the said second party for and in consideration of the premises hereinbefore set forth, that should he for any reason be unable to fulfil the conditions of this contract and deliver deed of warranty to said properties at the times and in the manner set forth in this contract, then and in that case this agreement shall be void and of no effect, and the said forfeiture hereinbefore set forth shall be returned in full to the said party of the second part, time being of the essence of this contract.

In Witness Whereof, the parties have hereunto set their hands and seals on the day and year first above written.

To a correct understanding of this case it will be necessary to trace the conduct of the parties from the beginning to the end of the controversy. The Essex Copper Company, with headquarters in the city of New York, was the owner of the property described in the contract known as the Norwich Mines, located in Ontonagon county, Michigan, consisting of about eight hundred forty acres of land. A. Meads was a director in this company, and during this controversy resided at Marquette, Michigan, and plaintiff resided at St. Paul. While no express written option was introduced in evidence, it appears from the cor-

respondence and conduct of the parties that Meads held an option or right of purchase at $60,000 from the Essex Copper Company, and on October 26, 1900, Meads granted plaintiff an option or right of purchase until January 26, 1901. It appears that an extension until March 31 was granted to plaintiff for $500 through Meads by the Essex Copper Company, which knew that plaintiff paid the money, knew that Meads was acting through plaintiff in selling the property, carried on correspondence with plaintiff about it, knew of the contract between plaintiff and defendant Coleman, and although it does not expressly appear that plaintiff's option or right of purchase was definitely extended beyond March 31 by the copper company, it does appear that the option which Meads held from that company remained in existence until at least April 27 following. It further appeared that the company knew plaintiff was selling the property to defendant Coleman, and forwarded a deed of the premises to carry the sale into effect.

It further appears that the abstract of title was delivered by plaintiff to defendant Coleman within the ten days provided in the contract, and that the twenty days within which Coleman was to examine and accept the title commenced to run on March 27 and expired April 16. The note mentioned in the contract was due April 5 but was not paid, and April 6 Coleman wrote to plaintiff excusing the delay, agreeing to take it up in a day or two. April 17 defendants' attorney wrote an opinion upon the title in which objections were raised, which were under review and determined upon the former appeal. On the same day plaintiff wrote Coleman at Minneapolis, complaining that he had not been furnished with a statement of the defects in the title, and expressing a willingness to correct the same. This letter was answered the same day by Coleman, in which he stated that his attorney had telephoned him to wait until April 17. Meads arrived in St. Paul from Marquette April 16. April 22 defendants' attorney wrote to Mr. Lockey, who held the note in escrow, notifying him, as Coleman's attorney, that the recorded title to the property had been examined and in many particulars found defective; that he had refused to pass the title until the same were removed and that he should hold the paper in escrow until further written notice.

Next in order of events was the following letter:

St. Paul, Minn., April 23, 1901.
Confidential.

H. H. Coleman, Esq., 6 P. M.

Dear Sir: I Cancel Mr. Womack's option. If you are prepared to see me, do so in the morning as early as convenient. Please reply by phone or wire.

Very Respect.

A. Meads.

Under date of April 24, Meads wrote to Womack at St. Paul, notifying him his option had expired for the reason that he had failed to make a sale of the property within its life, and on the same day Coleman and Meads were in consultation at St. Paul. The next step in the proceedings was that Coleman purchased the property from the Essex Copper Company through Meads; and the deed which had been in the Merchants' National Bank was delivered to Coleman, who wrote plaintiff from Chicago, April 30, offering to do the proper thing by him if he would release the note in the hands of Mr. Lockey.

The discussion upon this appeal may be embraced under three heads:

1. Although the agreement between plaintiff and Coleman in some respects is in the form of a contract of purchase and sale, yet, when the entire document is considered, it is no more than an option. It begins with a recital to the effect that plaintiff represents he holds an option for the purchase of the property, which he is desirous of conveying and confirming its sale to Coleman. The agreements on the part of plaintiff are that he will convey, or cause to be conveyed, the premises to the second party, by warranty deed, upon full performance by the second party. While the first party is bound to furnish the abstract, tender a good title, and cause the premises to be conveyed by a sufficient warranty deed, the second party was not obligated to make the remaining payments and accept the conveyance, even though a good and sufficient title be tendered.

An "option" has been defined as follows: "The obligation by which one binds himself to sell, and leaves it discretionary with the other party to buy, is what is termed in law an option, which is simply a contract

by which the owner of property agrees with another person that he shall have a right to buy the property at a fixed price within a certain time." Black v. Maddox, 104 Ga. 157, 30 S. E. 723. An option conveys no title to the thing sold, but creates rights in personam, which may be again sold or assigned by the vendee.

In the contract under consideration, defendant Coleman had the option to make the subsequent payments and accept the title, if good, or, if he chose, refuse it, even if marketable, and lose the $15,000 placed in escrow; and until he had obligated himself as an absolute purchaser of the land, either by acceptance of the title, or by the making of subsequent payments, as provided, no title passed to him, he acquired no interest as a purchaser under the contract, within the meaning of chapter 223, p. 431, Laws 1897, and no notice was required on the part of plaintiff to terminate his rights. Joslyn v. Schwend, 85 Minn. 130, 88 N. W. 410, 744.

2. Defendants insist there is no evidence in the case tending to show that plaintiff had any option for the sale of the premises; that the most he possessed was a broker's right under Meads to sell the property upon such terms and within such time as Meads himself chose to give him. We have already referred to the various transactions leading up to the cancellation of plaintiff's option by Meads, and the subsequent sale of the premises by Meads and Coleman, and at this time it is sufficient to call attention to the letters and admissions of the parties.

It is true that the option itself which Meads possessed from the Essex Copper Company was not introduced in evidence, but it is admitted by the correspondence of the Essex Copper Company, and by Meads as well as by defendant Coleman, that such an option was in existence. While the record does not contain any written express option running from Meads to plaintiff, yet that an option or right of purchase was in existence is admitted by the letters and admissions of Meads; and the copper company had knowledge of it; knew that Coleman was a prospective purchaser of plaintiff, based upon such option to Meads; knew that Meads came from Marquette to St. Paul to assist plaintiff's contract with Coleman. The Essex Copper Company, knowing these facts, forwarded its deed to a St. Paul bank for the purpose of enabling plaintiff to perfect such sale under his contract with Coleman. There

is no evidence that either Meads or the copper company denied plaintiff had the option referred to in his contract with Coleman. There is no evidence that either Meads or the copper company, because of plaintiff's lack of authority to represent them, or on account of any default or failure upon his part, repudiated plaintiff's acts in perfecting a sale to Coleman. Therefore there was evidence tending to show that plaintiff possessed the option which is referred to in the recital of his contract with Coleman, that he had authority to carry out and perfect the terms of that contract, and that in pursuance thereof he tendered an abstract which conveyed a good and marketable title, and was prepared to cause the premises to be conveyed to Coleman.

3. In the previous decision we held that the $15,000 note in lieu of the cash deposited in escrow was the agreed and stipulated damages, and not a forfeiture or penalty. It is apparent that the case was submitted at the second trial without regard to this decision, and upon this appeal plaintiff has assumed that the $15,000 is to be treated as a forfeiture and penalty, and not as liquidated damages. This course has confused the case. We adhere to the prior decision.

The agreement admits of no juggling. Its terms are explicit. Coleman had twenty days from the delivery to him of the abstract to examine and accept the title. If within that time he accepted the title, then he was required to do nothing more than execute the notes for the deferred payments; the deed to remain in escrow with the Merchants' National Bank, according to the instructions of the copper company. If, however, Coleman did not choose to accept the title, but raised objections to it, then plaintiff had a reasonable time thereafter within which to correct the title to meet the objections. According to the evidence, Coleman neither accepted nor expressly rejected the title within the twenty days. He made excuses for not paying the note and for not having the matter attended to, but he requested no additional time, and it does not appear whether more than twenty days was needed within which to examine and report upon the title.

Although Coleman failed to reject or accept the title within the twenty days, his failure to do anything was equivalent to a refusal to accept the title; and if, as the evidence tends to show, Coleman raised debatable objections to the title after the twenty days, which were taken

into consideration by plaintiff with a view to correcting them, such conduct on the part of plaintiff was in no sense a waiver of any of his rights under the contract. If there was such extension of time, it was for Coleman's benefit. Although, through his attorney, Coleman raised certain objections to the title which were untenable, yet it does not appear that he refused to complete the purchase on account of any defect in the title. On the contrary, it appears that Coleman purchased the property from the copper company through Meads, and accepted the deed based upon the same title which had been tendered him by plaintiff. The evidence tends to show that Meads and Coleman were acting in collusion for the express purpose of cancelling plaintiff's option, and to defraud him of his interest in the property. All plaintiff did was to insist upon the performance of his agreement, and there is nothing to indicate that he waived any of his rights. Under such circumstances, defendant Coleman will not be permitted to repudiate his contract and take advantage of his own fraud. So far as defendant Lindberg is concerned, he is bound by the acts of his codefendant, if he executed the note, gave it into the hands of Coleman with authority to use it, and plaintiff in good faith accepted it in lieu of the cash.

Much has been said with reference to the nature of this action, which is claimed to be one in equity brought to cancel the contract, and declare a forfeiture of the $15,000, and recover the amount of the forfeiture. As already stated, the nature of the contract is clearly defined in the previous decision. The complaint sets out the entire transaction, and plaintiff claims to be the owner of the note by reason of the fact that it was deposited in escrow, to be delivered to plaintiff in case Coleman should fail to carry out the terms of his agreement. There is evidence in the case tending to show that Coleman, without fault on the part of plaintiff, and without cause, repudiated his contract. The evidence in support of plaintiff's cause of action being sufficient to require the court to make findings of fact, it was error to dismiss the case.

Judgment reversed.